KENNETH BEAM d/b/a BEAM ASPHALT COMPANY v. JACK PARSONS d/b/a MENA RED-E-MIX

4604                                                    432 S.W. 2d 768

Opinion Delivered October 21, 1968

*Batchelor & Batchelor,* for appellant.

*Shaw & Shaw,* for appellee.

CARLTON HARRIS, Chief Justice.    Appellant, Kenneth Beam d/b/a Beam Asphalt Company, instituted action against appellee, Jack Parson d/b/a Mena Red-E-Mix, seeking judgment in the amount of $5,414.77, the allegations being that appellant had suffered that amount of damages by reason of appellee's furnishing defective and non-conforming base material, supposedly GB-3, this act necessitating the replacement of 2½ to 3 acres of parking lot.    Parsons filed a counterclaim for $3,759.41 representing materials furnished and equipment rendered and sold.    The case was tried before the court, sitting as a jury, and at the conclusion of the evidence, Beam's complaint was dismissed, and Parsons was granted judgment for the amount sought, plus interest from the date of judgment.    Appellant brings this appeal, asserting several points for reversal.

Of course, this being a case from the Circuit Court, we are only concerned with whether there was substantial evidence to support the trial court's decision, and it is accordingly unnecessary that we detail all of the evidence offered by appellant.

The facts, in brief, are that Beam took a sub-contract to build two parking lots, and a clay gravel sub-base was put in in approximately January, 1966.    In April of the same year Parsons agreed to furnish GB-3[1]. base material and No. 8 mineral aggregate for the job. In May, appellee delivered a sample of material, which was tested by Gene Daniel, a registered professional engineer of Fort Smith, and operator of a soil and concrete testing firm.    Mr. Daniel's report stated:

---

[1]GB-3 was defined by Daniel as a natural or artificial mixture of gravel and soil mortar uniformly well graded from coarse to fine, and free from objectionable materials, and that 100% of such material should pass through a 1½ inch screen.

"This material conforms to Arkansas Highway Department specifications for gravel base course GB-3."

Daniel testified that the sample was acceptable, and the report reflects that the sample came from the source of Parson's crushed gravel site. Beam's testimony reflects procedure after receiving the material:

"Well, after it's dumped on the job, the first thing after it's dumped on the job, you have got to do is take either a dozer or motor grader and spread the material, and as soon as it's roughly graded in, then you take your water and your rollers and grader, and usually those three pieces of machinery, well, you can prepare it, get your compaction and all with it."

He used 35,000 gallons of water on this job. After spreading the material, and wetting it, it was "prime-coated," and the seal coat was applied in early June. As the seal coat was rolled, it began to buckle under the weight of the roller, and the end result was that the GB-3 was taken off. A sample of the material used was given to Daniel who, after an examination, reported that it was not GB-3 material.

The evidence offered by various witnesses indicated that there could be six possible reasons for a parking lot to break apart, one being freezing, which cannot be considered here because there was no freezing weather during the period of construction. The other reasons given were improper rolling, excessive watering, improper compaction, base course too thin, and finally, defective materials, this latter cause being the contention of appellant.

Eli Depuis, employed by U. S. Motors as a manufacturing engineer, testified that he was already familiar with the lot which was paved before the GB-3 was placed on it; that part of the ground was hard, but the

side nearer the highway was softened to the extent that he could not drive his Volkswagen on it. Although he went by the job each day, he said that he never saw the employees of appellant rolling and compacting this soft area, recognizing however, that it could have been done when he was not present. Parsons likewise testified that he never did see any rolling done. This testimony was disputed by Roy Faleide, job superintendent for the prime contractor, and Donald Bolton, who was working for Beam on this particular job, i.e., both testified that the lot was properly rolled. As to excessive watering, Daniel testified that ordinarily, to water down 12,711 square yards of material, 2 inches thick, for a single seal job, 20 to 25 thousand gallons of water would be used, and 35,000 gallons would be more than enough. The witness stated that whether this last amount would have a detrimental effect would depend upon the subbase and sub-grade, i.e., whether there had been saturation. He said that 35,000 gallons on this project could be excessive, but there were too many intangibles to definitely reach such a conclusion.

An interesting observation was made by Dale Spencer, a resident engineer with the Arkansas State Highway Department, and James Looney, street commissioner of Mena, both stating that, in their opinion, 2 inches of GB-3 on top of the clay base would not be sufficient to carry traffic that would ordinarily be on a street or parking lot. When asked what his opinion would be if the evidence reflected that a lot with 4 inches of GB-3 material buckled the same way, Mr. Spencer stated that he would not express an opinion, since there are many things that can go wrong with a seal coat job. Spencer also testified that it was possible that materials could meet specifications when delivered, but not meet same when laid, and this could be either because the material was defective or because it was laid in an inefficient manner. Spencer mentioned that Daniel's manner of sampling was not in conformity with the Highway Department's general method,

but that the first Daniel report showed that the material was well within specifications.

Appellant objected to the testimony of Looney on the basis that this witness had not had sufficient experience to qualify as an expert. The proof reflected that Looney had been employed by the City of Mena for six years as street commissioner, and had been in charge of construction, repair, and maintenance of all city streets. He had not had experience with GB-3 materials. The witness had had experience in sealing since 1948 when working for the state, and we cannot say that it was an abuse of discretion for the trial court to admit this testimony. As stated in *Ray* v. *Fletcher*, 244 Ark. 74, 423 S.W. 2d 865:

> "The determination of the qualifications of an expert witness to express an opinion is within the discretion of the trial judge, and we will not reverse his decision unless it appears that he abused that discretion."

For that matter, this case was not tried before a jury, and there is no indication that the testimony of this witness had any particular influence on the court's decision, it being remembered that Spencer, whose qualifications were not questioned, testified to the same thing.

Jim Beam, brother of appellant, and also a general contractor, admitted that he had never seen GB-3 material laid thinner than 3 inches, and Mr. Faleide also testified that this was the first instance in which he had known of GB-3 materials being laid only 2 inches thick, although he stated that if the subbase, and other requirements of the job were complied with, the 2-inch thickness should not have too much effect.

As previously stated, there was evidence offered by appellant that the lot was properly rolled; that there was no excessive watering; that the sub-base had been

properly compacted and had been permitted to settle for 4 to 5 months before base material was put on it. The Beams and Faleide testified that, in their opinion, the buckling of the parking lot was not caused by the fact that the GB-3 was only 2 inches thick. Still, these were all fact questions to be determined by the trial court. Certainly, there was evidence that the condition could have been caused by other than defective materials, and the trial court was not required to believe the statements of every witness who testified.

Parsons testified that the first knowledge he had of any complaint was when he sought his money and was advised by Beam that the materials had been unsatisfactory. From Beam's testimony, it would appear that he had no suspicion of the cause of the trouble until the parking lot buckled, was ripped up, and a sample further tested by Daniel. This seems unusual, since Beam was an experienced contractor, and, according to highway engineer Spencer, the Highway Department runs a complete test on GB-3 material for every 500 yards. Of course, Beam could have tested the GB-3 at intervals before using, and any deficiency would have been found.[2]

Based on the testimony heretofore set out, we hold that there was substantial evidence to support the finding of the trial court.

Affirmed.

---

[2]Actually, Mr. Faleide testified that he observed some of the material as it was brought in, and that it did not look the same as the material delivered at the beginning of the job. He called this to the attention of both Parsons and the contractor, but stated, "They told me that it was the same material and that it would meet the specifications. The same material as had been delivered to start with and that tests were made." Accordingly, he had no further tests made. In referring to "they," it is not clear whether Faleide was referring to Beam or to the prime contractor, although it was probably the latter. However, if the appearance was such as to be questionable to Faleide, one wonders why it was not also questionable to Beam.